**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1748**

———————

FELICIA MORGAN, individually and as Guardian ad Litem of other Bobby Morgan,

        Plaintiff – Appellant,

v.

CITY OF CHARLOTTE; EDWARD GONZALEZ, both individually and in his official capacity as a law enforcement officer with CMPD; DEREK RUD, both individually and in his official capacity as a law enforcement officer with CMPD; JOSHUA SKIPPER, both individually and in his official capacity as a law enforcement officer with CMPD,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Kenneth D. Bell, District Judge.  (3:22−cv−00003−KDB−DCK)

———————

Argued:  May 6, 2026                              Decided:  June 29, 2026

———————

Before WILKINSON, KING, and GREGORY, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Gregory joined.

———————

**ARGUED:**  Hannah Lorraine Templin, JONES DAY, Washington, D.C., for Appellant. Steven Andrew Bader, CRANFILL SUMNER, LLP, Raleigh, North Carolina; Taylor Alexander Imperiale, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for

Appellees.  **ON BRIEF:** Jennifer L. Swize, JONES DAY, Washington, D.C., for Appellant. Roger A. McCalman, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee City of Charlotte.  Stephanie H. Webster, CRANFILL SUMNER LLP, Charlotte, North Carolina, for Appellee Derek Rud.  Caroline B. Barrineau, Daniel E. Peterson, PARKER POE ADAMS & BERNSTEIN LLP, Charlotte, North Carolina, for Appellee Edward Gonzalez.  Terry L. Wallace, WALLACE LAW FIRM, PLLC, Charlotte, North Carolina, for Appellee Joshua Skipper.

---

WILKINSON, Circuit Judge:

Bobby Morgan suffers from bipolar and schizoaffective disorders. One morning, he called the police about two neighbors and threatened to shoot them while wielding a pistol. He then retreated to his home, fired his gun twice, and holed up inside for roughly half an hour as police contained the area. Eventually, Bobby resumed firing, doing so repeatedly and haphazardly into the neighborhood. At that point, officers shot Bobby three times.

Bobby's pistol turned out to be a "prop gun." While it looked realistic on the outside, it could fire only blanks, not bullets. Understandably troubled, Bobby's mother and legal guardian, Felicia Morgan, sued on his behalf. She claimed that the officers used excessive force when they shot at Bobby, violating his Fourth Amendment rights. She further alleged the City of Charlotte failed to accommodate Bobby's ailments, in violation of the Americans with Disabilities Act ("ADA"), because local police did not adequately try to deescalate the situation. Disagreeing, the district court granted summary judgment to the defendants.

It was right to do so. Although the facts here are undoubtedly sad, unfortunate circumstances do not always yield legal liability. Here, a reasonable officer on the scene would have had good reason to believe that Bobby posed a threat of serious physical harm. The police also acted reasonably in trying to accommodate Bobby's illnesses. We affirm.

I.

Bobby shared a duplex with two women next door. His relationship with them was a rocky one. One morning in 2018, Bobby confronted them because he believed they had been knocking on the wall between their units all night, disturbing his sleep. When they

3

allegedly threatened to shoot Bobby in response, he called the police. Over the phone, he pretended to be a police officer, recounted his issues with his neighbors, said he intended to protect himself, and revealed he had a gun.

As someone "adjudicated mentally incompetent," Bobby could not lawfully own a firearm. N.C. Gen. Stat. § 14-404(c)(4) (2022). Even so, he possessed a nine-millimeter EKOL Sava Magnum. A prop gun intended primarily for acting, the pistol can shoot only blanks—not bullets. On the exterior, however, it very much looks like a functional firearm:



J.A. 1768. It behaves like a functional firearm, too. That is, when firing a blank, the pistol produces a loud gunshot-like sound and often a gunshot-like flash.

### A.

Two officers responded to Bobby's call: Jensen Tilson and Joseph Ellis. For a few minutes, they tried his doorbell to no answer. Bobby eventually emerged from the side of his home, still posing as law enforcement, and began detailing his altercation with the

4

neighbors. In the process, he leaned over and dropped his prop gun, which had been loosely placed in the front pocket of his jacket. Bobby promptly picked it up and put it back in his pocket.

Some moments later, Tilson went to speak with the neighbors on the other side of the lawn. That left Ellis with Bobby. Over eleven minutes, Bobby described the encounter with his neighbors in a rambling and largely incomprehensible manner. He grew increasingly antagonistic, repeatedly expressing his violent intentions the next time either neighbor approached him. Here is an example: "Bitch, [if] [she] come[s] in my yard, I'm gonna blow [her] brains out. . . . [Either] one of them." Digital Ex. 2 at 17:42–18:40. Bobby also promised to shoot his neighbors if they did not move out by the end of the month.

Ellis expressed discomfort with these threats and offered ways for Bobby to resolve his issues peaceably. But Bobby demurred, bringing the topic back each time to his desire to shoot his neighbors. He then crossed over the yard and shared these choice words with them directly. After doing so, Bobby retreated to his side of the property, leaving the police alone with the neighbors. A few minutes later, he returned to confront the group again.

Most of the body camera footage of this second exchange lacks audio. That said, at some point, Bobby gestured toward his gun, which prompted Tilson to reach for it. Observing this, Bobby backed up, kept the gun in his pocket, and made for his home. Ellis walked alongside him for a few steps, trying to calm him down and ease tensions. Uncooperative, Bobby stormed inside and shouted at the group from a distance as he did so.

5

The officers and neighbors talked among themselves for a few minutes. That came to a halt when they heard a gunshot from Bobby's home. Ellis promptly radioed to dispatch that shots were fired.

B.

As backup arrived minutes later, another gunshot was heard from inside Bobby's home. Law enforcement accordingly surrounded the duplex and monitored his movements. For the next half hour, Bobby did not discharge his gun again, nor did officers shoot at him. During this standoff, Bobby repeatedly glanced out of a front window, "laughing" and "pulling the curtain back, showing his wallet, showing money, showing DVDs, all kinds of stuff." Digital Ex. 6 at 34:31–34:45.

Joining the scene was Felicia. A friend informed her that the police had surrounded Bobby's home, prompting her to call 911 and tell the operator that Bobby has mental issues and does not own a gun. (Dispatch relayed this information to the responding officers.) She also tried calling Bobby three times. He picked up on the third try, alleging that he did not do anything and that the neighbors lied about him. When Felicia arrived, she pleaded with the police not to shoot Bobby, crying out many times that he was mentally ill and did not own a gun. She also tried to enter Bobby's duplex unit, but officers prevented her from doing so because of the risk it posed. After Felicia continued to vocally and physically resist the officers' orders to stop, they handcuffed her and placed her in a squad car.

As that was happening, Bobby exited his back door and fired his gun. Viewing this was a defendant in the case, Joshua Skipper, who proceeded to order Bobby four times to drop the gun. At that point, Skipper claims Bobby pointed the pistol toward him. According

6

to Bobby's testimony, however, he never pointed his pistol at anyone. Either way, Skipper returned fire several times but missed each shot. Bobby promptly went back inside. Every officer on site could hear the exchange of fire, and Skipper radioed that shots were fired.

Moments afterward, Bobby returned to the front window and shot his pistol again. He appeared to fire indiscriminately into the street, without aiming at anyone in particular. As before, an officer responded by shooting back. This time it was Edward Gonzalez, another defendant, who fired once and potentially struck Bobby. The exchange left one visible hole in Bobby's front window—from Gonzalez's shot. Over the next few minutes, Bobby discharged his gun several more times from inside his duplex unit.

Cue the final individual defendant, Derek Rud. He arrived shortly after Gonzalez's discharge, learning over the police radio about Bobby's standoff and subsequent gunfire. Gonzalez directed Rud's attention to the front window, stating that Bobby had shot out of it twice. Roughly three minutes later, Bobby reappeared in the window and, according to Rud's testimony, aimed in the direction of Gonzalez and another officer. (Bobby denies so aiming.) Rud shot once, causing Bobby to wince but failing to make him drop the gun or his stance. So Rud shot again, at which point Bobby dropped out of view of the window.

Shortly thereafter, Bobby emerged from his home to surrender. Police detained him and promptly requested medical care. He had been shot three times. After undergoing extensive surgery and treatment, Bobby survived.

C.

Felicia sued Skipper, Gonzalez, Rud, and the City of Charlotte. In relevant part, her complaint made two claims: First, she alleged that the officers' use of deadly force was

7

excessive, violating the Fourth Amendment. Second, she alleged the City of Charlotte failed to accommodate Bobby's disorders, violating the ADA.

The district court disagreed, granting summary judgment to the defendants on both claims. As to excessive force, it explained that a reasonable officer in the shoes of Gonzalez and Rud would have thought Bobby posed an imminent deadly threat. It added that Skipper could not be liable because none of his bullets struck Bobby. And as to the ADA, the district court held that the police acted reasonably under exigent circumstances and that Felicia's proposed accommodations all unduly risked the lives of officers and civilians.

Felicia appeals. We review her claims de novo, taking the evidence and drawing all reasonable inferences in her favor. *Quinn v. Zerkle*, 111 F.4th 281, 290 (4th Cir. 2024).

## II.

Start with the excessive force claims. "[U]nder the Fourth Amendment's 'objective reasonableness' standard," we ask whether the officers' use of force was justified "from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989). This requires us to "careful[ly] balanc[e]" the civilian's interest in bodily autonomy with the government's interest in safe and effective law enforcement. *Id.* at 396. We do so by consulting the totality of the circumstances, *id.*, which includes the moment the officer applied force and "[t]he history of the interaction, as well as other past circumstances known to the officer," *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025).

## A.

The familiar totality-of-the-circumstances test does not lend itself to any mechanical inquiry. However, we have said one factor carries special importance: "whether the suspect

8

posed an immediate threat to the safety of" those around him. *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024). Bobby posed just that. Numerous times, he drew and discharged his gun while defying orders from the police to stand down. Just as Bobby created a lethal danger to those around him, the police responded with lethal force. That is, there was a one-for-one "relationship between the need for the use of force and the amount of force used." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

We recognize Bobby testified that he merely shot his gun aimlessly, which of course presented a lower risk of harm than had he been shooting directly at people. But the threat was still present, and it was still grave. "The firing of a weapon poses a risk that a bystander will be injured by a stray bullet." *United States v. Alexander*, 609 F.3d 1250, 1257 (11th Cir. 2010). Reports indicate that hundreds of Americans fall victim to stray bullets each year. *See, e.g.*, Garen J. Wintemute et al., *Epidemiology and Clinical Aspects of Stray Bullet Shootings in the United States*, 73 J. Trauma & Acute Care Surgery 215, 216, 218 (2012). Considering that Bobby was firing in a densely populated and residential part of Charlotte, the officers had particularly good reason to believe he was threatening the lives of—if not their fellow officers—the rest of the neighborhood. Such a serious risk of harm "to others" suffices to warrant the use of deadly force. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Other common considerations in an excessive-force inquiry confirm our conclusion. Regarding "the severity of the crime at issue," *Graham*, 490 U.S. at 396, the officers had substantial reason to believe Bobby committed several violent felonies by threatening his neighbors and discharging an unlawfully owned firearm in a residential area, despite

9

commands to stop. He was "actively resisting arrest," too. *Id.* When Bobby exited out of the back door, Skipper yelled at him four times to drop his weapon. Bobby not only refused to do so, but he also retreated into his home and fired even more shots. It took a coordinated effort among police, as well as three rounds to land, for Bobby to surrender.

Viewing everything together, the officers' use of force was not excessive. From the perspective of a reasonable officer, Bobby was "threaten[ing] the [police and his neighbors] with a weapon," "there [wa]s probable cause to believe he ha[d] committed a crime involving the . . . threatened infliction of serious physical harm," and "some warning ha[d] been given" before the use of deadly force. *Garner*, 471 U.S. at 11–12. We thus need not entertain the counterfactual of whether the officers' behavior, assuming it was unlawful, amounted to violating a clearly established right. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### B.

Felicia contends, however, that the above discussion of the totality of the circumstances omits one crucial fact, namely that Bobby's gun was a prop built to shoot only blanks. This does not affect our analysis. "[F]rom the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, Bobby's firearm looked like a working gun, sounded like a working gun, and behaved like a working gun. Without being told otherwise, a reasonable officer would think it could fire actual, lethal bullets.

Just look again at the picture above. The gun has a metallic muzzle and trigger with a black grip. It produces a loud discharge with periodic flashes when fired. And nothing on the exterior of the weapon indicates it is harmless. (In fact, Felicia stated the gun probably

once had an orange tip on the end of the barrel, a safety feature differentiating it from a functional firearm, "that fell off or was removed at some point." Oral Arg. at 15:32–15:39.) For all that law enforcement knew, Bobby was frantically waving around and discharging a weapon capable of causing death, or at least serious injury, at the pull of a trigger.

Resisting this conclusion, Felicia argues the officers facing the front of the duplex (Gonzalez and Rud) should have recognized that Bobby's gun was not functional because his shots out of the front window left no bullet holes. But assessing the reasonableness of force "with the 20/20 vision of hindsight" is precisely what we cannot do. *Graham*, 490 U.S. at 396. Police often must "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at 397. The shooting here exemplifies this fact: Gonzalez returned fire just five seconds after Bobby shot out of the front window. And in a few minutes' time, Rud arrived, learned Bobby had been shooting out of the window, and fired. Both officers lacked an opportunity to reflect on the scene, notice that Bobby's shots did not leave holes, and rule out other explanations, such as the possibility that Bobby fired dud rounds from an otherwise working gun.

Felicia further contends the police should have heeded her assurances in the moment that Bobby did not have a gun. But her claims "defie[d] the reality of the situation." *Rambert v. City of Greenville*, 107 F.4th 388, 401 (4th Cir. 2024). That is, Bobby *did* have a gun, just one that could shoot only blanks. Equally insignificant are Felicia's subsequent claims that Bobby's gun was not "real" and that the front window had "no hole." Digital Ex. 5 at 54:00–54:30. For one thing, Felicia directed these statements solely to Tilson and

11

tendered them only after Skipper, Gonzalez, and Rud had already fired at Bobby. For another, Felicia seems to have observed Bobby's front window only *before* he ever appeared to shoot out of it. Once Gonzalez fired at Bobby, by contrast, the window had a visible hole—just one made by Gonzalez, not Bobby. Perhaps a reasonable officer in Gonzalez's position would have found the lack of any holes in the window probative if he had several minutes of time to think about it, as Felicia did. But Gonzalez had just five seconds, during which he was worried about the imminent threat posed by Bobby's seemingly indiscriminate firing into the street.

The prop gun looked and sounded too much like the real thing. Here, a reasonable officer would have determined Bobby was shooting actual bullets. We cannot expect police to act with "omniscience." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

C.

The active shooter scene in this case readily separates it from the typical excessive force claim surviving summary judgment. There is no dispute that Bobby was armed. *See, e.g.*, *Clem v. Corbeau*, 284 F.3d 543, 550–51 (4th Cir. 2002). There is no dispute that Bobby discharged his firearm. *See, e.g.*, *Cooper v. Doyle*, 163 F.4th 64, 78 (4th Cir. 2025). And there is no dispute that Bobby was resisting arrest. *See, e.g.*, *Livingston v. Kehagias*, 803 F. App'x 673, 684 (4th Cir. 2020).

Felicia analogizes to past police shootings of armed civilians that we have found potentially unlawful, but those cases saw deadly force in response to the mere holding of a firearm pointed at the ground, without any furtive movement or prior police warning. *E.g.*, *Cooper v. Sheehan*, 735 F.3d 153, 159–60 (4th Cir. 2013); *Hensley ex rel. N.C. v. Price*,

12

876 F.3d 573, 582 (4th Cir. 2017). By contrast, the police here resorted to deadly force only after Bobby repeatedly raised and fired his gun while defying their orders. "No citizen can fairly expect to draw," let alone discharge, "a gun on police without risking tragic consequences." *Elliott*, 99 F.3d at 644.

The better comparison is to our case law granting summary judgment for reasonable, though mistaken, perceptions of imminent danger. For example, in *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991), an officer shot a suspect who kept his hands out of view, despite police commands to raise them, and turned his body toward the officer while gripping "an object." *Id.* at 215. While the object turned out to be a beer bottle, *id.*, we granted qualified immunity because it was reasonable for the officer to think the bottle was a deadly weapon, *id.* at 216–17. The same logic prevailed in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001). There, an officer shot a suspect who lowered his hands in violation of police orders. *Id.* at 128. While he did so merely to turn off his Walkman, *id.*, we found no Fourth Amendment violation because it was reasonable for the officer to believe the suspect was reaching for a gun, *id.* at 132–33.

"This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Id.* at 131. If there is a reasonable belief that a suspect has a weapon, his furtive movements in violation of police commands lay the ground for the lawful use of deadly force. *Benton v. Layton*, 139 F.4th 281, 291 (4th Cir. 2025). This remains true even if the suspect has not yet raised his weapon or has no weapon at all. *See Slattery*, 939 F.2d at 216–17; *Anderson*, 247 F.3d at 132–33.

13

Surely Bobby's raising and firing of a prop gun, in contravention of police orders, provides an even clearer basis to shoot back.

## D.

Felicia also takes issue with how the district court analyzed events before the use of deadly force. For context, between the district court's decision and our review, the Supreme Court held that the Fourth Amendment's excessive force analysis requires evaluating *both* "the situation at the precise time of the [force]" *as well as* "earlier facts and circumstances." *Barnes*, 145 S. Ct. at 1358. In so doing, it abrogated several circuits' case law—including our own—that focused solely on "the circumstances existing at the precise time an officer perceived the threat inducing him to [use force]." *Id.* at 1356; *see also Greenidge v. Ruffin*, 927 F.2d 789, 791–92 (4th Cir. 1991), *abrogated by Barnes*, 145 S. Ct. 1353. Through no error of its own, the district court applied our now-outdated precedent. Contrary to Felicia's protests, however, this does not warrant vacatur, let alone reversal.

### 1.

We can of course resolve an issue in the first instance when "there is an intervening change in the case law," such as "a newly resolved Supreme Court case." *Anderson v. Crouch*, 169 F.4th 474, 495 (4th Cir. 2026) (quoting *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 105 (4th Cir. 2020)). Especially so here. The record spans over two thousand pages with hours of body camera footage at different angles covering the affair, beginning with the response to Bobby's call and ending with his detainment. Additional discovery would not yield any more useful information than what we already have before us.

14

We also stress that "the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review." *Barnes*, 145 S. Ct. at 1358. Much of Felicia's appeal overlooks this intuitive principle. For example, she argues Gonzalez should have more heavily considered deescalation because, months before the shooting, he and other officers peaceably ended a similar altercation between Bobby and his neighbors. This, she says, shows that Bobby can be talked down. But of course, a person's mood can change on a whim, particularly when he suffers from bipolar and schizoaffective disorders. And Gonzalez had a strong basis to think Bobby would behave more aggressively than he had months ago given that he not only had a gun this time around but had been firing it erratically.

In short, our review of the totality of the circumstances does not negate our need to focus on the life-threatening circumstances confronting law enforcement in the moment that they deploy deadly force. The past informs this inquiry to be sure. Yet we cannot require that an officer submit himself to a present danger because the encounter began peaceably, or because some prior, unrelated encounter posed no harm. Indeed, it would be wholly unreasonable for authorities to ignore an ongoing threat based merely on what happened in the past. And here, the events leading up to the officers' deadly force fall well short of neutralizing the harm posed by the active shooter scene that was before them.

### 2.

Felicia's main criticism on this front is that the police did not successfully deescalate. According to her, the officers (particularly Gonzalez, who was on site for about half an hour) used excessive force by too readily resorting to shooting Bobby. Had they

15

spent the thirty-odd minutes before then warning Bobby or trying to talk him down, her argument goes, things could have ended peaceably. On both the facts and law, we disagree.

Remember how the encounter started. After threatening to kill his neighbors, Bobby retreated to his home and fired his gun. This immediately differentiates the case from the precedent Felicia cites, where the suspects either were unarmed or had weapons without posing to use them. *See Garner*, 471 U.S. at 3; *Hensley*, 876 F.3d at 578; *Deorle v. Rutherford*, 272 F.3d 1272, 1276–77 (9th Cir. 2001). Remember too how the encounter unfolded. When responding officers established a perimeter around Bobby's home, he continued to hole up. At no point before the officers' deadly force did Bobby show an inclination to surrender. To the contrary, when Bobby exited out of the back door, he defied Skipper's repeated orders to drop his weapon. We thus need not speculate about how Bobby would have responded to the alternative deescalation tactics that Felicia posits. He continuously resisted detainment, defied police orders, and erratically discharged his gun.

We have long declined "to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing." *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). The Supreme Court rejected such a "rigid precondition[]" too, reasoning that it contravenes the deliberately flexible inquiry set forth in the Fourth Amendment. *Scott v. Harris*, 550 U.S. 372, 382 (2007). In other words, attempted deescalation is but one of many factors in our totality-of-the-circumstances analysis. And, as noted above, Bobby was in no mood to deescalate, and earlier police attempts to deescalate the situation were wholly unavailing. At the end of the day, "all that matters is whether [the officers'] actions were reasonable." *Id.* at 383. And in this case, they were.

16

III.

Turn next to the ADA claim. That statute prohibits disability-based discrimination, which can include "den[ying]" a "qualified individual with a disability . . . the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. We have held that the ADA applies in police investigations and arrests, requiring that officers "mak[e] reasonable accommodations to the known physical or mental limitations" of suspects with disabilities. *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 (4th Cir. 2012) (quoting 42 U.S.C. § 12112(b)(5)(A)).

The parties agree Bobby is a qualified individual with a disability. They likewise agree law enforcement knew as much. They disagree, however, about whether the defendants reasonably accommodated Bobby's mental conditions.

A.

While our case law acknowledges that officers can fail to accommodate a qualified individual's disability when seizing him, the bar to prevail on such a claim is high. Indeed, excessive force and failure-to-accommodate claims are interrelated. Where, as here, the force employed by officers was objectively reasonable, any failure to accommodate is not likely to be an unreasonable one.

Felicia cannot carry her burden under the ADA. For starters, law enforcement tried to accommodate Bobby. Over an eleven-minute conversation, Ellis pitched ways for Bobby to peacefully resolve future disputes with his neighbors, such as by calling the police whenever he felt threatened. But Bobby refused each one, instead rambling on about how he would kill his neighbors the next time they approached him. Bobby then ended the

17

conversation, despite Ellis's desire to keep talking things over, and personally communicated these threats to his neighbors before retreating to his property. When Bobby returned, Ellis again tried to calm him down—even after Bobby appeared to reach for his pistol. Bobby then stormed back inside and, minutes later, fired the first shot. Through it all, Bobby firmly declined law enforcement's invitations to enter an interactive process to identify a mutually workable accommodation. *See Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1032–33 (5th Cir. 2022).

At oral argument, Felicia obliquely suggested that Ellis and Tilson should have immediately taken Bobby's gun and arrested him because of his known mental illnesses. But Bobby did not ask for that, and depriving someone of his property and liberty as soon as legally possible can hardly be called an accommodation. In fact, even if Congress wanted to penalize state police for failing to timely effectuate an arrest, we question whether it holds that authority. *See generally Printz v. United States*, 521 U.S. 898 (1997).

Felicia alternatively contends that law enforcement failed to accommodate Bobby after his initial gunshots. We again disagree. For starters, the circumstances became exigent, at the latest, once Bobby fired his gun. That urgency colors our inquiry into the officers' subsequent conduct. After all, "[a]ccommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence." *Waller ex rel. Est. of Hunt v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009).

With this urgency in mind, the officers' actions during the standoff strike us as entirely reasonable. Even after Bobby tendered death threats and fired his pistol, law enforcement did not barge in with guns blazing. Rather, they secured the area and waited

18

for over half an hour, firing only in response Bobby's frenzied shooting. At no point before then did Bobby show a desire to surrender. Given such time-sensitive and life-threatening circumstances, the officers did all that was expected of them. Could they have defused matters by trying other deescalation tactics? Perhaps. But does that ipso facto render what they did unreasonable? Of course not. "The ADA requires reasonableness, not perfection." *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 171 (4th Cir. 2024).

B.

Instructive is our decision in *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171. In that case, a mentally unwell man, Rennie Hunt, was holding his girlfriend hostage in his apartment. *Id.* at 172–73. Officers tried for nearly two hours to confirm the girlfriend's safety and to end the altercation without violence. *Id.* at 173. But Hunt repeatedly refused them admission, eventually threatening to "blow [the hostage negotiator's] goddamned head off." *Id.* At that point, police ceased negotiations, obtained a warrant for Hunt's arrest, and breached his apartment. *Id.* Officers fatally shot Hunt after he rushed toward them while swinging what looked like a scythe and a knife. *Id.*

The administrator of Hunt's estate brought an ADA claim, alleging law enforcement failed to accommodate Hunt's mental disability. *Id.* Notably, she criticized officers on the scene for not "summoning mental health professionals and family members" who would have helped talk Hunt down. *Id.* at 176. Unpersuaded, we rejected these proposals for engaging in impermissible hindsight and undervaluing the risk of serious harm that the suspect posed. *Id.* We thus affirmed the district court's grant of summary judgment to the

19

defendants, explaining that they acted reasonably in the exigent circumstances before them. *Id.* at 177.

The similarities to this case are striking. Just as law enforcement there ended talks after Hunt threatened to shoot a hostage negotiator, *id.* at 173, the police here ended talks after Bobby seriously threatened neighbors and began firing his gun. Just as exigent circumstances there endured for two hours while "police attempted to calm the situation," *id.* at 177, the exigent circumstances here lasted for at least the half hour in which officers surrounded Bobby's home. And just as the panel there refused to second-guess the officers' judgment, *id.* at 176, we refuse to do so here.

Consider, for example, Felicia's criticisms of the police for stopping Felicia from entering Bobby's home and for not contacting people specialized in interacting with the mentally ill. These are just rehashes of the accommodations proposed by the plaintiff in *Waller.* It is not incumbent on officers to convene a mental health clinic when other calming alternatives existed and were attempted, but all to no avail.

As in *Waller*, the authorities in this case repeatedly tried to talk Bobby down from violence. They waited outside his home for a long while, using force only in response to a perception of danger. As we said in *Waller*, "[a]ll of these actions reflect the officers' considered judgment that a period of waiting might calm [the suspect] and bring a peaceful resolution to the standoff." *Id.* at 177. Seeing little daylight between the officers' actions here and those in *Waller*, we too affirm the district court's grant of summary judgment. Inasmuch as the officers' conduct was in no way unlawful, there is no basis for imposing liability upon the City of Charlotte.

20

IV.

We wish that these events had ended differently, and we regret the suffering that Bobby and Felicia experienced. It goes without saying that mental illness is no trivial matter. At the same time, unfortunate circumstances alone do not automatically give rise to a cognizable legal claim—be it under the Constitution, the ADA, or elsewhere. Here law enforcement reasonably believed Bobby posed an imminent threat of serious physical harm. While the officers did what they could to turn down the temperature, Bobby's chaotic shooting into the neighborhood left them little choice but to return fire.

*AFFIRMED*